KOLOVRAT ET AL. *v.* OREGON.

No. 102.  Argued March 30, 1961.—Decided May 1, 1961.

*Lawrence S. Lesser* argued the cause for petitioners. With him on the brief was *Peter A. Schwabe.*

*Catherine Zorn,* Assistant Attorney General of Oregon, argued the cause for respondent.  With her on the brief were *Robert Y. Thornton,* Attorney General, and *Arthur Garfield Higgs,* Assistant Attorney General.

Solicitor General *Rankin,* Assistant Attorney General *Doub,* Acting Assistant Attorney General *Leonard* and *Alan S. Rosenthal* filed briefs for the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

Joe Stoich and Muharem Zekich died in Oregon in December 1953 without having made wills to dispose of personal property they owned in that State. Their only heirs and next of kin, who but for being aliens could have inherited this Oregon property under Oregon law, were brothers, sisters, nieces and nephews who were all residents and nationals of Yugoslavia. But § 111.070 of the Oregon Revised Statutes rather severely limits the rights of aliens not living in the United States to "take" either real or personal property or its proceeds in Oregon "by succession or testamentary disposition." [1] And subsec-

---

[1] "(1) The right of an alien not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this state by succession or testamentary disposition, upon the same terms and conditions as inhabitants and citizens of the United States, is dependent in each case:

"(a) Upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as inhabitants and citizens of the country of which such alien is an inhabitant or citizen;

"(b) Upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign country; and

"(c) Upon proof that such foreign heirs, distributees, devisees or legatees may receive the benefit, use or control of money or property from estates of persons dying in this state without confiscation, in whole or in part, by the governments of such foreign countries.

"(2) The burden is upon such nonresident alien to establish the fact of existence of the reciprocal rights set forth in subsection (1) of this section."

tion (3) of the same Oregon statute provides that where there are no next of kin except ineligible aliens and the deceased made no will, the property of the deceased shall be taken by the State as escheated property.

The State filed petitions under this provision in an Oregon Circuit Court to take for itself the personal property of both decedents,[2] alleging that there were no next of kin eligible to take under Ore. Rev. Stat. § 111.070. The answers filed by the Yugoslavian relatives and the San Francisco Consul General of that country (who are petitioners here) alleged that "in fact and in law reciprocal rights of inheritance as prescribed by ORS 111.070 did exist" between the United States and Yugoslavia when the decedents died and that the Yugoslavian relatives therefore were eligible to take under Oregon law. After hearings in which evidence was taken, the trial court found that the reciprocal right of inheritance required by § 111.070 (1)(a) did exist and that, both at the time the two deceased died and at the time of the trial, there existed "rights of citizens of the United States to receive payment to them within the United States . . . of moneys originating from the estates of persons dying within the country of Yugoslavia" as required by § 111.070 (1)(b). The State Supreme Court reversed, holding that petitioners had failed to prove "the ultimate fact" that there existed "as a *matter of law an unqualified and enforceable right to receive* as defined by ORS 111.070."[3] It found instead that such an unqualified right did not exist because the laws of Yugoslavia give discretion to Yugoslavian authorities to control foreign exchange payments in a way that might prevent Americans from receiving the full value of Yugoslavian inheritances. It was accordingly held that Oregon state law standing alone barred

---

[2] The Circuit Court consolidated the two cases and they have been treated as one since.

[3] 220 Ore. 448, 461, 349 P. 2d 255, 262.

these Yugoslavian nationals from inheriting their relatives' personal property in Oregon.

The state court went on to say that this holding disposes of petitioners' claims "[u]nless the area of alien succession over which the state of Oregon seeks to control through ORS 111.070, supra, has been preempted by some treaty agreement subsisting between Yugoslavia and the United States" at the time of the decedents' death. On this point the court said:

> "We are mindful that rights of succession to property under local law may be affected by an overriding federal policy when a treaty makes different or conflicting arrangements. In such event, the state policy must give way. *Clark v. Allen,* 331 US 503, 517 . . . ." 220 Ore. 448, 462, 349 P. 2d 255, 262–263.

Thus, recognizing quite properly that state policies as to the rights of aliens to inherit must give way under our Constitution's Supremacy Clause to "overriding" federal treaties and conflicting arrangements, the state court considered petitioners' contention, supported in this Court by the Government as *amicus curiae,* that petitioners were entitled to inherit this personal property because of an 1881 Treaty between the United States and Serbia, which country is now a part of Yugoslavia. The state court rejected this contention on the basis of its interpretation of the Treaty although it correctly recognized that the Treaty is still in effect between the United States and· Yugoslavia.[4] The state court also rejected petitioners' contention that their claims could not be defeated solely because of the possible effect of the Yugoslavian Foreign

---

[4] The Treaty is reported at 22 Stat. 963. Official recognition that it is still in effect can be found in the Settlement of Pecuniary Claims Against Yugoslavia Agreement between the United States and Yugoslavia of July 19, 1948, 62 Stat. 2658, T. I. A. S. 1803, Art. 5.

Exchange Laws and Regulations since those laws and regulations admittedly meet the requirements of the Bretton Woods Agreement of 1945,[5] to which both Yugoslavia and the United States are signatories. We granted certiorari because the cases involve important rights asserted in reliance upon federal treaty obligations. 364 U. S. 812.

For reasons to be stated, we hold that the 1881 Treaty does entitle petitioners to inherit personal property located in Oregon on the same basis as American next of kin and that these rights have not been taken away or impaired by the monetary policies of Yugoslavia exercised in accordance with later agreements between that country and the United States.

## I.

The parts of the 1881 Treaty most relevant to our problem are set out below.[6] The very restrictive meaning

[5] 60 Stat. 1401, T. I. A. S. 1501.

[6] "The United States of America and His Highness the Prince of Serbia, animated by the desire of facilitating and developing the commercial relations established between the two countries, have determined with this object to conclude a treaty . . . .

"ARTICLE I.

"There shall be reciprocally full and entire liberty of commerce and navigation between the citizens and subjects of the two high contracting powers, who shall be at liberty to establish themselves freely in each other's territory.

.          .          .          .

"ARTICLE II.

"In all that concerns the right of acquiring, possessing or disposing of every kind of property, real or personal, citizens of the United States in Serbia and Serbian subjects in the United States, shall enjoy the rights which the respective laws grant or shall grant in each of these states to the subjects of the most favored nation.

"Within these limits, and under the same conditions as the subjects of the most favored nation, they shall be at liberty to acquire and

given the Treaty by the Oregon Supreme Court is based chiefly on its interpretation of this language:

> "In all that concerns the right of acquiring, possessing or disposing of every kind of property . . . citizens of the United States in Serbia and Serbian subjects in the United States, shall enjoy the rights which the respective laws grant . . . in each of these states to the subjects of the most favored nation."

This, the State Supreme Court held, means that the Treaty confers a right upon a United States citizen to acquire or inherit property in Serbia only if he is "in Serbia" and upon a Yugoslavian citizen to acquire property in the United States only if he is "in the United States." The state court's conclusion, therefore, was that the Yugoslavian complainants, not being residents of the United States, had no right under the Treaty to inherit from their relatives who died leaving property in Oregon. This is one plausible meaning of the quoted language, but it could just as plausibly mean that "in Serbia" all citizens of the United States shall enjoy inheritance rights and "in the United States" all Serbian subjects shall enjoy inheritance rights, and this interpretation would not restrict almost to the vanishing point the American and Yugoslavian nationals who would be benefited by the clause. We cannot accept the state court's more restrictive interpretation when we view the Treaty in the light

---

dispose of such property, whether by purchase, sale, donation, exchange, marriage contract, testament, inheritance, or in any other manner whatever, without being subject to any taxes, imposts or charges whatever, other or higher than those which are or shall be levied on natives or on the subjects of the most favored state.

"They shall likewise be at liberty to export freely the proceeds of the sale of their property, and their goods in general, without being subjected to pay any other or higher duties than those payable under similar circumstances by natives or by the subjects of the most favored state."

of its entire language and history. This Court has many times set its face against treaty interpretations that unduly restrict rights a treaty is adopted to protect.[7]

The 1881 Treaty clearly declares its basic purpose to bring about "reciprocally full and entire liberty of commerce and navigation" between the two signatory nations so that their citizens "shall be at liberty to establish themselves freely in each other's territory." Their citizens are also to be free to receive, hold and dispose of property by trading, donation, marriage, inheritance or any other manner "under the same conditions as the subjects of the most favored nation." Thus, both paragraphs of Art. II of the Treaty which have pertinence here contain a "most favored nation" clause with regard to "acquiring, possessing or disposing of every kind of property." This clause means that each signatory grants to the other the broadest rights and privileges which it accords to any other nation in other treaties it has made or will make. In this connection we are pointed to a treaty of this country made with Argentina before the 1881 Treaty with Serbia,[8] and treaties of Yugoslavia with Poland and Czechoslovakia,[9] all of which unambiguously provide for the broadest kind of reciprocal rights of inheritance for nationals of the signatories which would precisely protect

---

[7] See, e. g., Bacardi Corp. v. Domenech, 311 U. S. 150, 163; Jordan v. Tashiro, 278 U. S. 123, 128–129.

[8] Treaty of Friendship, Commerce, and Navigation, Between the United States and the Argentine Confederation of 1853, 10 Stat. 1005, 1009, I Malloy 20. Article IX of this Treaty provides: "In whatever relates to . . . acquiring and disposing of property of every sort and denomination, either by sale, donation, exchange, testament, or in any other manner whatsoever, . . . the citizens of the two contracting parties shall reciprocally enjoy the same privileges, liberties, and rights, as native citizens . . . ."

[9] Yugoslav-Polish Treaty, 30 League of Nations Treaty Series 185; Yugoslav-Czechoslovakian Treaty, 85 League of Nations Treaty Series 455.

the right of these Yugoslavian claimants to inherit property of their American relatives.

The rights conferred by the 1881 Treaty, broadly stated as they are, would fall far short of what individuals would hope or desire for their complete fulfillment if one who by work and frugality had accumulated property as his own could be denied the gratification of leaving his property to those he loved the most, simply because his loved ones were living in another country where he and they were born. Moreover, if these rights of "acquiring, possessing or disposing of every kind of property" were not to be afforded to merchants and businessmen conducting their trade from their own homeland, the Treaty's effectiveness in achieving its express purpose of "facilitating . . . commercial relations" would obviously be severely limited.[10] It is not in such a niggardly fashion that treaties designed to promote the freest kind of traffic, communications and associations among nations and their nationals should be interpreted, unless such an interpretation is required by the most compelling necessity. There is certainly no such compulsion in the 1881 Treaty's language or history.

While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight.[11] We have before us statements, in the form of diplomatic notes exchanged between the responsible agencies of the United States and of Yugoslavia, to the effect that the 1881 Treaty, now and always, has been construed as providing for inheritance by both countries' nationals without regard to the loca-

---

[10] Besides the obvious relevance of Art. II of the Treaty even when considered alone, Art. III specifically contemplates the interchange of "merchants, manufacturers and trades people" or "their clerks and agents."

[11] See, e. g., Factor v. Laubenheimer, 290 U. S. 276, 294–295.

tion of the property to be passed or the domiciles of the nationals. And relevant diplomatic correspondence and instructions issued by our State Department show that the 1881 Treaty was one of a series of commercial agreements which were negotiated and concluded on the basis of the most expansive principles of reciprocity. The Government's purpose in entering into that series of treaties was in general to put the citizens of the United States and citizens of other treaty countries on a par with regard to trading, commerce and property rights.[12]

The Oregon Supreme Court apparently thought itself bound to decide this question of treaty construction against petitioners because of our decision in *Clark* v. *Allen,* 331 U. S. 503. We do not agree. In that case we held that a 1923 Treaty with Germany did not confer rights upon German nationals residing in Germany to inherit from American citizens. The German Treaty did contain some language which, when considered in isolation, could be thought to be sufficiently similar to the controlling provisions of the 1881 Treaty to suggest that these parts of the two treaties should be interpreted to have the same meaning.[13] But the differences between the two treaties are crucial. The German Treaty covered only disposal of property; the 1881 Treaty very broadly covers acquisition of property as well as disposal. The treaty before us, as we have pointed out, contains the highly significant "most favored nation" clause, long used to broaden the scope of rights protected by treaties;

---

[12] See, *e. g.,* Report on Negotiations dated Nov. 30, 1850, printed as Senate Confidential Document No. 1, 31st Cong., 2d Sess., 5 Miller, Treaties and Other International Acts of the United States 861; D. S., 15 Instructions, Argentina, 19–26, 6 Miller, *supra,* 219.

[13] The language relied upon by the Oregon Supreme Court was: "Nationals of either High Contracting Party may have full power to dispose of their personal property of every kind within the territories of the other . . . ."

the German Treaty had no "most favored nation" clause. Moreover, the language of other treaties which was almost identical with the pertinent provision in the German Treaty had previously been given a very limited construction by this Court, a construction from which we were unwilling to depart in *Clark* v. *Allen*. Finally, the relevant history of the negotiations for, the interpretation of and the practices under the 1881 Treaty support petitioners' claims, but no such supporting history was brought to our attention with respect to the German Treaty.

We hold that under the 1881 Treaty, with its "most favored nation" clause, these Yugoslavian claimants have the same right to inherit their relatives' personal property as they would if they were American citizens living in Oregon; but, because of the grounds given for the Oregon Supreme Court's holding, we shall briefly consider whether this treaty right has in any way been abrogated or impaired by the monetary foreign exchange laws of Yugoslavia.

## II.

Oregon law, its Supreme Court held, forbids inheritance of Oregon property by an alien living in a foreign country unless there clearly exists "as a matter of law an unqualified and enforceable right" for an American to receive payment in the United States of the proceeds of an inheritance of property in that foreign country. The state court held that the Yugoslavian foreign exchange laws in effect in 1953 left so much discretion in Yugoslavian authorities that it was possible for them to issue exchange regulations which might impair payment of legacies or inheritances abroad and for this reason Americans did not have the kind of "unqualified and enforceable right" to receive Yugoslavian inheritance funds in

the United States which would justify permitting Yugoslavians such as petitioners to receive inheritances of Oregon property under Oregon law. Petitioners and the United States urge that no such doubt or uncertainty is created by the Yugoslavian law, but contend that even so this Oregon state policy must give way to supervening United States-Yugoslavian arrangements. We agree with petitioners' latter contention.

The International Monetary Fund (Bretton Woods) Agreement of 1945, *supra,* to which Yugoslavia and the United States are signatories, comprehensively obligates participating countries to maintain only such monetary controls as are consistent with the terms of that Agreement. The Agreement's broad purpose, as shown by Art. IV, § 4, is "to promote exchange stability, to maintain orderly exchange arrangements with other members, and to avoid competitive exchange alterations." Article VI, § 3, forbids any participating country from exercising controls over international capital movements "in a manner which will restrict payments for current transactions or which will unduly delay transfers of funds in settlement of commitments . . . ." Article 8 of the Yugoslavian laws regulating payment transactions with other countries expressly recognizes the authority of "the provisions of agreements with foreign countries which are concerned with payments." [14] In addition to all of this, an Agreement of 1948 between our country and Yugoslavia [15] obligated Yugoslavia, in the words of the Senate Report on the Agreement, "to continue to grant most-favored-nation treatment to Americans in ownership and acquisition of assets in Yugoslavia . . . [and] Yugo-

[14] Law To Regulate Payments to and from Foreign Countries, Foreign Exchange Law, Official Gazette of the Federal People's Republic of Yugoslavia, Oct. 25, 1946, Belgrade, No. 86, Year II.
[15] See note 4, *supra.*

slavia is required, by article 10, to authorize persons in Yugoslavia to pay debts to United States nationals, firms, or agencies, and, so far as feasible, to permit dollar transfers for such purpose." [16]

These treaties and agreements show that this Nation has adopted programs deemed desirable in bringing about, so far as can be done, stability and uniformity in the difficult field of world monetary controls and exchange. These arrangements have not purported to achieve a sufficiently rigid valuation of moneys to guarantee that foreign exchange payments will at all times, at all places and under all circumstances be based on a "definitely ascertainable" valuation measured by the diverse currencies of the world. Doubtless these agreements may fall short of that goal. But our National Government's powers have been exercised so far as deemed desirable and feasible toward that end, and the power to make policy with regard to such matters is a national one from the compulsion of both necessity and our Constitution. After the proper governmental agencies have selected the policy of foreign exchange for the country as a whole, Oregon of course cannot refuse to give foreign nationals their treaty rights because of fear that valid international agreements might possibly not work completely to the satisfaction of state authorities. Our National Government's assent to these international agreements, coupled with its continuing adherence to the 1881 Treaty, precludes any State from deciding that Yugoslavian laws meeting the standards of those agreements can be the basis for defeating rights conferred by the 1881 Treaty.

The judgment of the Supreme Court of Oregon is reversed and the cause remanded for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

---

[16] S. Rep. No. 800, 81st Cong., 1st Sess., p. 4.