Joyce M. HILL, Appellant,

v.

Gale A. NORTON, Secretary, United States Department of the Interior, et al., Appellees.

No. 00-5432.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 14, 2001.

Decided Dec. 28, 2001.

Erik S. Jaffe argued the cause and filed the briefs for appellant.

Kathryn E. Kovacs, Attorney, United States Department of Justice, argued the cause for appellees. With her on the brief were John C. Cruden, Acting Assistant Attorney General, Jeffrey Dobbins and Larry M. Corcoran, Attorneys.

Before: EDWARDS and ROGERS, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703-712 (2000), extends protection to all birds covered by four migratory bird treaties, which, in relevant part, define migratory birds to include the family Anatidae. Congress has delegated authority to the Secretary of Interior ("Secretary") to implement the treaties covered by the MBTA. *See* 16 U.S.C. § 712(2). Under this authority, the Secretary has published lists of protected migratory birds.

The instant case arose when appellant Joyce Hill filed a law suit *pro se* in District Court claiming that the Secretary's regulation violated the MBTA in excluding mute swans from the *List of Migratory Birds* promulgated at 50 C.F.R. § 10.13 (2000). The District Court rejected Hill's claim and granted summary judgment in favor of the Secretary. Hill now appeals from that adverse judgment.

The disposition of this case is very nearly governed by *Chevron* step one. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). This is so because the plain meaning of the statute and the applicable treaties strongly indicates that mute swans are qualifying migratory birds under the MBTA. We hesitate, however, to decide this case on *Chevron* step one grounds, because of the odd regulatory scheme created by the MBTA which refers to four different treaties to glean a single substantive definition of migratory birds and the absence of any agency pronouncement on the specific issue before the court. We therefore assume, *arguendo*, that the disputed agency action is not positively foreclosed by the plain meaning of the statute.

Even indulging in such an assumption, however, the Secretary's position fails under *Chevron* step two. The Secretary points to nothing in the MBTA, treaties, or administrative record to support the exclusion of mute swans from the *List of Migratory Birds*. And the statute and relevant treaty support Hill's claim that mute swans should be included on the list. Accordingly, we reverse the judgment of the District Court on Hill's MBTA claim, grant judgment for appellant, and vacate the Secretary's *List of Migratory Birds*, codified at 50 C.F.R. § 10.13, insofar as the list excludes mute swans. We affirm the judgment of the District Court rejecting Hill's complaint resting on the National Environmental Policy Act ("NEPA"). We agree with the trial court that the NEPA claim is meritless.

## I. BACKGROUND

### A. Mute Swans

Mute swans – scientifically titled cygnus olor – are undisputed members of the family Anatidae. Mute swans in the United States probably descend from European birds introduced for ornamental purposes beginning in the mid-19th century. MICHAEL A. CIARANCA, ET AL., MUTE SWAN, THE BIRDS OF NORTH AMERICA No. 273, 1 (1997). Mute swans generally do not migrate long distances, making only "short-distance seasonal movements" to find ice-free water. *Id.* at 3. They are "highly territorial" and can treat other species with "direct antagonism." *Id.* at 10. Indeed, the Government claims that mute swans "occupy habitat and consume food used by migratory, endangered, and threatened species." Keith M. Weaver Decl. ¶ 16, *reprinted in* Joint Appendix ("J.A.") 24. There is also information to suggest that mute swans cause ecological damage: "As an exotic, feral species, the Mute Swan's effects on native ecosystems are a concern. Potential effects range from overgrazing aquatic vegetation to displacing native waterfowl."

CIARANCA, *supra*, at 2. *See also* Mem. from Rowan W. Gould, Acting Director of Fish and Wildlife Service, to Regional Directors 1 (Mar. 24, 1995), *reprinted in* J.A. 79 ("If uncontrolled, mute swans pose a serious threat to the ecological integrity of many areas, including the National Wildlife Refuge System and other Federal lands committed to the maintenance of natural wildlife diversity.").

Generally, state governments have assumed responsibility for the management of mute swan populations. Recently, however, Department of the Interior ("DOI") officials at the Blackwater National Wildlife Refuge secured a permit from the Maryland Department of Natural Resources to kill up to 50 mute swans per year. DOI officials claim to have taken only *ad hoc* measures to control mute swan populations, and they assert that "no concerted effort to eradicate mute swans from any refuge has been undertaken by the [Fish and Wildlife Service]." Ronald E. Lambertson Decl. ¶ 8, *reprinted in* J.A. 67.

B. Statutory and Regulatory Background

The MBTA states that,

[u]nless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful ... to pursue, hunt, ... [or] kill ... any migratory bird ... included in the terms of the conventions between the United States and Great Britain [on behalf of Canada] ..., the United States and the United Mexican States ..., the United States and the Government of Japan ..., and the ... United States and the Union of Soviet Socialist Republics.

16 U.S.C. § 703. The MBTA does not define "migratory bird" but merely refers to the treaties for a definition. The Secretary, however, has declared that:

*Migratory bird* means any bird, whatever its origin and whether or not raised in captivity, which belongs to a species listed in § 10.13.

50 C.F.R. § 10.12. Section 10.13, in turn, lists "all species of migratory birds protected by the [MBTA]." 50 C.F.R. § 10.13. The only swans on the *List of Migratory Birds* in § 10.13 are trumpeter, tundra, and whooper swans. The Secretary's regulations do not explain why mute swans are excluded from the *List of Migratory Birds*.

The four treaties to which the MBTA refers each provide different definitions of covered birds. The 1916 treaty with Great Britain ("the Canada Treaty") broadly defines migratory birds to include "Anatidae or waterfowl, including brant, wild ducks, geese, and swans." Convention for the Protection of Migratory Birds, Aug. 16, 1916, art. I, § 1(a), U.S.-Gr. Brit., 39 Stat. 1702. The Proclamation to the Canada Treaty refers to birds that migrate across national borders:

Whereas, Many species of birds in the course of their annual migrations traverse certain parts of the United States and the Dominion of Canada; and

Whereas, Many of these species are of great value ... but are nevertheless in danger of extermination through lack of adequate protection during the nesting season or while on their way to and from their breeding grounds.

*Id.* Canada and the United States amended the 1916 treaty with a 1995 Protocol that revised the definition of migratory birds to include "Anatidae, or waterfowl (ducks, geese and swans)." Protocol Amending the 1916 Convention for the Protection of Migratory Birds in Canada and the United States, Dec. 14, 1995, art. I, § 1, U.S.-Can., Sen. Treaty Doc. 104-28.

The 1936 treaty with Mexico also defines migratory birds broadly to include "Familia Anatidae." Convention for the Protec-

tion of Migratory Game Birds and Game Mammals, Feb. 7, 1936, art. IV, U.S.-Mex., 50 Stat. 1311. The introductory Proclamation to the Mexico Treaty refers to "migratory" birds without regard to their origin:

> Whereas, some of the birds denominated migratory, in their movements cross the United States of America and the United Mexican States, in which countries they live temporarily;
>
> Whereas it is right and proper to protect the said migratory birds, whatever may be their origin, in the United States of America and the United Mexican States, in order that the species may not be exterminated.

*Id.*

The 1972 treaty with Japan defines migratory birds more specifically:

> (a) The species of birds for which there is positive evidence of migration between the two countries from the recovery of bands or other markers; and
>
> (b) The species of birds with subspecies common to both countries or, in the absence of subspecies, the species of birds common to both countries. The identification of these species and subspecies shall be based upon specimens, photographs or other reliable evidence.

Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, Mar. 4, 1972, art. II, § 1, U.S.-Japan, 25 U.S.T. 3331. The Japan Treaty also contains an annex that specifically lists "species defined as migratory birds." *Id.* at art. II, § 2(a). The only swan identified in the annex is the whooper swan, cygnus cygnus. *Id.* at Annex.

Finally, the 1976 treaty with the Soviet Union defines migratory birds as:

> (a) The species or subspecies of birds for which there is evidence of migration between the Soviet Union and the United States derived as a result of banding, marking or other reliable scientific evidence; or
>
> (b) The species or subspecies of birds, populations of which occur in the Soviet Union and the United States and have common flyways or common breeding, wintering, feeding, or moulting areas, and for these reasons there exists or could exist an exchange of individuals between such populations. The identification of such species or subspecies will be based upon data acquired by banding, marking, or other reliable scientific evidence.

Convention Concerning the Conservation of Migratory Birds and Their Environment, Nov. 19, 1976, art. I, § 1, U.S.-U.S.S.R., 29 U.S.T. 4649. Similar to the Japan Treaty, the Soviet Union Treaty includes an annex listing species by name. Only three swan species – whooper, bewick's, and whistling swans – are listed in the Annex. *Id.* at Annex.

The first regulations implementing the MBTA simply imported the language of the Canada treaty. *See, e.g.,* U.S. Dep't of Agric., Bureau of Biological Survey, 11 *Service and Regulatory Announcements* 1, 2 (Aug. 21, 1916) (defining migratory birds, in relevant part, as "Anatidae or waterfowl, including brant, wild ducks, geese, and swans"). After a few rounds of statutory changes that placed regulatory authority with the President and the Secretary of Interior, the President, by Executive Order, delegated sole authority to the Secretary to promulgate regulations under the MBTA. *See* Exec. Order No. 10,250, 16 Fed.Reg. 5,385 (June 7, 1951). The Secretary initially maintained the established definition of migratory birds. *See, e.g.,* 50 C.F.R. § 10.1 (1961).

In 1965, the Secretary issued a Notice of Proposed Rule Making which sought to, among other things, "further clarify and

define the term 'migratory birds' " by adding a requirement that birds be "indigenous to the United States." 30 Fed.Reg. 5,640 (Apr. 21, 1965). These regulations were adopted in 1965, *see* 30 Fed.Reg. 7,571 (June 10, 1965), but the indigenous requirement was short-lived. Two years later, the Secretary amended the MBTA regulations by adding a definition of migratory birds that did not include the indigenous requirement. *See* 32 Fed.Reg. 10,855 (July 25, 1967) (printing new 50 C.F.R. § 1.11). This new definition did not, however, replace the old definition, thus leaving the regulations with two different definitions of migratory birds.

These dual definitions remained in place until 1973, when the Secretary deleted 50 C.F.R. § 1.11 and changed the definition of migratory birds to include

> all birds, whether or not raised in captivity, included in the terms of the [migratory bird] conventions between the United States and any foreign country.

38 Fed.Reg. 22,015, 22,016 (Aug. 15, 1973). The Secretary also published a list of covered migratory birds, 50 C.F.R. § 10.13, "[f]or reference purposes only." *Id.* at 22,017. The only swans included on the final list were the trumpeter and whooper swans. *See* 50 C.F.R. § 10.13 (1973).

The Secretary proposed revised regulations in 1984 that added a different qualification to the *List of Migratory Birds*. *See* 49 Fed.Reg. 23,197, 23,198 (June 5, 1984). The operative definition of migratory birds remained the same, but the Secretary proposed to "[a]dd species that are of regular occurrence in the United States that were not included on the last List," and also to "[d]elete species whose occurrence in the United States is deemed accidental, i.e., the U.S. is outside the species' normal range and occurrence is infrequent and irregular." *Id.* The Secretary adopted these changes, *see* 50 Fed.Reg. 13,708

(Apr. 5, 1985), and the regulations remained in effect until this lawsuit was filed.

## C. Procedural Background

Appellant Hill, appearing *pro se*, filed a complaint in District Court on July 16, 1999, which was amended on July 30, 1999. Her principal claim was that the Secretary's failure to include the mute swan on the *List of Migratory Birds* protected under the MBTA was arbitrary and capricious under the Administrative Procedure Act ("APA"). On September 27, 2000, the District Court granted summary judgment for the federal defendants. The trial court rejected the defendants' argument that Hill lacked standing to pursue her claim. On this point, the District Court found that the "Federal Defendants' failure to protect the mute swan under the MBTA is causally linked to the diminished presence of the swan in and about [Hill's] property on the Eastern Shore of Maryland," that the decline in mute swans reduces Hill's aesthetic enjoyment of her property, and that the decline "will be ameliorated if Federal Defendants include the bird under the MBTA." *Hill v. Babbitt*, Civ. Act. No. 00-01926, slip op. at 5 (D.D.C. Sept. 27, 2000). On the merits, the trial court found that the treaties underlying the MBTA impose conflicting obligations, thus creating an ambiguity in the MBTA with regard to whether mute swans must be included on the list of protected migratory birds. Faced with this purported ambiguity, the District Court held that "agency deference is the most plausible alternative" and granted judgment for the federal defendants. *Id.* at 13. The trial court also ruled against Hill on her NEPA claim, holding that she had introduced nothing to support the contention that the government was obliged to conduct an Environmental Impact Statement ("EIS") under

the NEPA. *Id.* at 6 n. 15. Hill filed a notice of appeal on November 27, 2000.

## II. DISCUSSION

### A. Jurisdiction

The Secretary no longer challenges Hill's standing to pursue her claims in federal court, and with good reason. There is no doubt that the District Court was correct in holding that Hill satisfies the standing requirements of Article III. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., (TOC), Inc.,* 528 U.S. 167, 183, 120 S.Ct. 693, 705, 145 L.Ed.2d 610 (2000) ("environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972))); *Wabash Valley Power Ass'n, Inc. v. FERC,* 268 F.3d 1105, 1113 (D.C.Cir.2001) (holding that if injury is traceable to agency decision and a favorable decision by the court will nullify the action that gave rise to injury, then plaintiff has satisfied causation and redressability requirements of Article III standing).

Because the MBTA does not create a private right of action or otherwise provide a process for judicial review, the Secretary's disputed failure to include the mute swan on the *List of Migratory Birds* can only be challenged by Hill under the APA. Though the APA does not directly grant subject matter jurisdiction to the federal courts, *see Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977), challenges brought under the APA fall within the reach of the general federal jurisdiction statute, 28 U.S.C. § 1331. *Road Sprinkler Fitters Local Union 669 v.*

*Herman,* 234 F.3d 1316, 1319 (D.C.Cir. 2000).

As Hill notes,

This case primarily presents the straight-forward question whether the Mute Swan (*Cygnus olor*) is a member of the family *anatidae* as that phrase is used in two treaties between the United States and, respectively, the United Kingdom (on behalf of Canada) and Mexico, and hence are covered as a protected species under the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703 *et seq.* The Department of the Interior has excluded Mute Swans from a regulatory list of species that it deems protected by the MBTA. 50 C.F.R. § 10.13. Such exclusion has led to numerous adverse actions – including killing and egg destruction – against Mute Swans, thus injuring those who, like plaintiff, derive immense aesthetic and cultural value from the presence of Mute Swans in our environment.

The case presents the further question whether the conduct of the Federal Defendants adverse to Mute Swans constitutes "major Federal action[]" requiring preparation of an Environmental Impact Statement (EIS) pursuant to the National Environmental Policy Act (NEPA). 42 U.S.C. § 4332(2)(C).

Br. for Appellant at 3-4. The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 to hear these claims, and this court has jurisdiction pursuant to 28 U.S.C. § 1291. We will address the two disputed issues in turn.

### B. The MBTA and the Treaties

The MBTA covers all migratory birds, as defined by the four cited treaties with Canada, Mexico, Japan, and the Soviet Union. The Government concedes that the most restrictive treaty definition of migratory birds – *i.e.,* the one found in the

Canada treaty – governs the disposition of this case. *See Alaska Fish & Wildlife Fed'n v. Dunkle,* 829 F.2d 933, 941 (9th Cir.1987) (holding that "[t]he United States-Canada Convention is the most restrictive of the four treaties, and all of the Secretary's regulations must be in accord with that treaty"). The Government also concedes that under the literal terms of the most restrictive treaty – the Canada treaty – "swans," without limitation, are migratory birds and therefore presumptively within the protected class. Furthermore, Government Counsel acknowledged at oral argument that, because of the seasonal movements of some mute swans across the U.S.-Canada border, mute swans are undoubtedly "migratory birds." Finally, no party doubts the authority of the Secretary, under § 712(2) of the MBTA, to issue regulations that create and refine lists of migratory birds, such as the list promulgated at 50 C.F.R. § 10.13. The only MBTA issue before this court, therefore, is whether the Secretary was justified in excluding the mute swan from the *List of Migratory Birds.*

Under the familiar *Chevron* analysis, "the reviewing court must first exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Bell Atl. Tel. Cos. v. FCC,* 131 F.3d 1044, 1047 (D.C.Cir.1997) (quotations and citations omitted). The parties, unsurprisingly, disagree over the meaning of the MBTA. Hill argues that a simple syllogism decides this case: the operative treaty defines migratory birds as "swans"; mute swans are, indeed, swans; and, therefore, the treaty covers mute swans. The Secretary, on the other hand, claims that the statute's purported simplicity actually ensconces its ambiguity: the MBTA does not define migratory birds; while the Canada Treaty references all swans, its Proclamation speaks only of birds that migrate between the U.S. and Canada; though swans are at home all over the world, only some swans migrate between the U.S. and Canada or are native to the signatory nations; therefore, it would make no sense to include every swan species within the protective ambit of the MBTA. And, of course, the Secretary claims that any statutory ambiguity is properly resolved pursuant to the agency's delegated authority to regulate under the MBTA.

Hill clearly has the better of this argument, for the statute appears as plain as she suggests. The Secretary's argument is specious: it rests on a convoluted and strained attempt to find ambiguity where none appears. Absent some limiting language, references to "swans" and "family Anatidae," as are found in the Canada treaty, undisputably include mute swans. We can discern no ambiguity. And the literal terms of the statute and treaty do not produce nonsensical results, as the Government suggests. Rather, the disposition of the principal issue in this case is very nearly governed by *Chevron* step one, and that disposition favors appellant Hill.

■ Because this case implicates several aged treaties about which the Secretary has said virtually nothing, we hesitate to decide the matter under *Chevron* step one. This hesitation comes in part from our recognition of the rule that a court must pay "great weight" to "the meaning given [to treaties] by the departments of government particularly charged with their negotiation and enforcement." *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961). In this case, however, we have nothing more than the Secretary's *List of Migratory Birds,* with nothing to explain why mute swans are excluded from the list. Thus, in a situation in which we would normally look to the Government for guidance in assessing the meaning of dis-

puted treaties, the record is barren. We could, of course, simply apply *Chevron* step one in Hill's favor, for the Canada treaty and the MBTA, together, support her claim. Instead, we will give the Government the benefit of the doubt, at least for now, and analyze the case under *Chevron* step two. In other words, because the Secretary has yet to address the issue at hand, we will assume, *arguendo,* that the disputed agency action is not positively foreclosed by the plain meaning of the statute. We do not mean to say, however, that the Secretary can overcome the apparent plain meaning of the statute and the treaties if and when the Secretary offers an explanation for the *List of Migratory Birds. See Prod. Workers Union of Chicago v. NLRB,* 793 F.2d 323, 328 (D.C.Cir.1986) ("When the intent of Congress is clear ... the court must give effect to the intent of Congress regardless of the agency's opinion."). We leave that question for another day.

Turning to *Chevron* step two, we must determine "whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 843, 104 S.Ct. at 2782. In other words, we must defer to the Secretary's interpretation of the MBTA only if it is reasonable and consistent with the statutory purpose and legislative history. *See Bell Atl. Tel. Cos.,* 131 F.3d at 1049. If the terms of the disputed statute (and, in this case, the disputed treaties) militate against the agency's position, and if the agency has offered no support for its decision, then the agency decision cannot be upheld under *Chevron* step two.

■ This court cannot presume the reasonableness of an agency's decision when the terms of the statute (and treaties) appear to be contrary to that decision and the agency has failed to justify its position. Counsel for the Secretary offered several arguments supporting the reasonableness

of the mute swan's exclusion from the *List of Migratory Birds*: the mute swan is not a native species, the mute swan's aggressive and territorial nature causes harm to other protected species and habitats, and extending protection to the mute swan might affect other treaty obligations of the United States and statutory obligations of the Secretary. We have no idea whether these arguments are pertinent, and, if so, whether they are compelling. It does not matter, however, for we do not assume that the arguments of counsel are the same as the Secretary's official position. In fact, the agency record in this case is utterly silent on any basis, let alone any reasonable basis, to support the exclusion of mute swans from the *List of Migratory Birds*. And, it is well understood that "[t]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

■ In arguments to this court, counsel for the Secretary contended that the non-native character of the mute swan justified the bird's exclusion from the list. However, no agency decision explains the definition of "native," whether the mute swan is native or non-native, and most importantly, why the native or non-native character of a species is relevant under the statute and treaties. This complete absence of support from the record is especially important here, because Hill argues that other birds on the *List of Migratory Birds* are non-native under many common definitions. *See* Reply Br. for Appellant at 20-21. To uphold the Secretary's exclusion on this ground would require this court to determine that an unpublished, unmentioned, undefined, and uncertain factor could reasonably exclude an otherwise qualified bird from protection.

Government counsel also claimed that the mute swan's destructive and aggres-

sive nature support the mute swan's exclusion from the *List of Migratory Birds*. The Secretary points to nothing in the statute, treaties, or administrative record to support this conclusion, however. In fact, it is unclear how such a consideration could ever overcome a statutory requirement to the contrary.

Likewise, Government counsel's argument that inclusion of the mute swan on the *List of Migratory Birds* may affect the Secretary's other statutory and treaty obligations is meritless. According to Counsel, the North American Wetlands Conservation Act ("Conservation Act"), 16 U.S.C. §§ 4401-4414, indicates that Congress passed other legislation with the "understanding that the MBTA and the migratory bird treaties require the United States to protect only native species." Br. of Appellees at 30. We disagree. The Conservation Act defines migratory birds as "all wild birds native to North America that are in an unconfined state and that are protected under the [MBTA]" 16 U.S.C. § 4402(5). To qualify as a migratory bird under the Conservation Act, two separate, independent conditions must be met: the bird must be a native wild bird *and* protected under the MBTA. The Conservation Act does not in any way limit the definition of migratory bird under the MBTA and, by placing an additional limitation on the MBTA's definition, Congress expressly excluded some birds that qualify as migratory birds under the MBTA from the Conservation Act's reach. Indeed, had Congress evinced the understanding claimed by counsel, the phrase "all wild birds native to North America" would merely duplicate the MBTA's definition. Furthermore, including the mute swan in the *List of Migratory Birds* does not prevent the Secretary from controlling any potential harmful effects caused by mute swans, because 16 U.S.C. § 704 delegates authority to the Secretary to adopt regulations allowing the "hunting, . . . capture, [or] killing" of protected migratory birds.

In sum, the Secretary points to nothing in the statute, applicable treaties, or administrative record that justifies the exclusion of mute swans from the *List of Migratory Birds*. And, as noted above, both the MBTA and the Canada treaty support Hill's claim that the mute swan must be included on the list. The Secretary's decision therefore fails review under *Chevron* step two.

## C. National Environmental Policy Act

■ Appellant Hill also argues that the NEPA required the Secretary to prepare an EIS with regard to its treatment of mute swans. The NEPA requires an EIS for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In her brief to this court, Hill identified several actions which she claims qualify as major federal action: obtaining a permit from the Maryland Department of Natural Resources ("MDNR") to take up to 50 mute swans per year; cooperating with the MDNR's Mute Swan management efforts, including assisting in burn management programs that affect mute swan nesting sites; cooperating with the Atlantic Flyway Council and endorsing its recommendations to manage the mute swan population; instructing Fish and Wildlife Regional Directors to control mute swans on federal land; and deciding to exclude mute swans from coverage under the MBTA.

Before the District Court, however, Hill only argued that the Secretary was required to conduct an EIS under the NEPA "for the trumpeter swan, before massive reintroduction efforts on a national level began" and before the "massive killing and mutilation of mute swans" began. Amended Complaint at 4-5. The District Court found, and Hill does not now dispute, that

the "Federal Defendants have submitted uncontroverted declarations which indicate none of them has engaged in an ongoing or proposed program to reintroduce trumpeter swans to the Atlantic Flyway or to exterminate mute swans." *Hill v. Babbitt*, slip op. at 6 n.15. Because the two grounds for invocation of the NEPA raised below were dismissed without a dispute of material fact below, Hill cannot now identify any "major Federal actions" properly before this court that would require the preparation of an EIS. Accordingly, the District Court committed no error in dismissing Hill's NEPA claims.

### III. CONCLUSION

For the reasons given above, we reverse the judgment of the District Court on Hill's MBTA claim, grant judgment for appellant, and vacate the Secretary's *List of Migratory Birds,* codified at 50 C.F.R. § 10.13, insofar as the list excludes mute swans. We affirm the District Court's entry of summary judgment on Hill's NEPA claims.

*So ordered.*