# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 2, 2008　　　　　Decided February 13, 2009

No. 07-5026

JOYCE M. HILL,
APPELLANT

v.

ROWAN W. GOULD, ACTING DIRECTOR, UNITED STATES FISH
AND WILDLIFE SERVICE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 99cv01926)

　　　*John F. Karl Jr.* argued the cause and filed the briefs for appellant.

　　　*Ellen J. Durkee*, Attorney, U.S. Department of Justice, argued the cause for federal appellees.  With her on the brief was *Kathryn E. Kovacs*, Attorney.  *Larry M. Corcoran*, Attorney, entered an appearance.

　　　Before: HENDERSON, RANDOLPH, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: After winning a lawsuit against the Secretary of the Interior, Joyce M. Hill filed an application to recover her attorney's fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412. The district court denied the application on the basis that the Secretary's position at the merits stage was substantially justified. Hill appealed. We affirm.

I.

The mute swan, a bird indigenous to Eurasia, was introduced into the United States for ornamental purposes in the 19th and 20th centuries. Joyce Hill took up the cause of the mute swan in 1999. She sued nineteen federal, state and private defendants, complaining of numerous wrongs the mute swan species had allegedly suffered. Her principal claim was that the Secretary of the Interior improperly denied the species the protection of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703-712. The Treaty Act limits *inter alia* the pursuit, hunting and killing of migratory birds covered by four treaties to which the United States is a party. *See Humane Society v. Glickman*, 217 F.3d 882, 884–85 (D.C. Cir. 2000). The Secretary of the Interior wields broad authority to implement the treaties. 16 U.S.C. § 712(2); *see also id.* § 704. Pursuant to that authority, the Secretary published a list of protected migratory birds in 1973 and revised it in 1985. *List of Migratory Birds*, 50 C.F.R. § 10.13 (1999). The list did not include the mute swan.

The district court held that the Secretary's *List of Migratory Birds* rested on a permissible construction of the Treaty Act and granted the Secretary's motion for summary judgment. *Hill v. Babbitt*, No. 99-CV-1926, 2000 WL 33912018 (D.D.C. Sept. 27, 2000). On appeal, this court

reversed. In *Hill* v. Norton, 275 F.3d 98 (D.C. Cir. 2001), the court held that the Secretary's exclusion of the mute swan from the protected bird list was arbitrary and capricious under the Administrative Procedure Act.

Hill's winning claim turned on the meaning of a key statutory term — "migratory bird" — which the Treaty Act did not define at the time of Hill's suit.[1] The Act stated only that its protections extend to "any migratory bird . . . included in the terms of" four bilateral treaties that the United States signed with Great Britain (on behalf of Canada), Mexico, Japan and the Soviet Union. 16 U.S.C. § 703(a). Each treaty defines the protected class of birds differently. *See Hill*, 275 F.3d at 100–01 (cataloguing the relevant treaty language). By the time Hill appealed to this court, all parties agreed that the Canada Treaty should control because it is the broadest of the four treaties. *Id.* at 103–04. The introductory Proclamation to the Canada Treaty refers to birds that "traverse" the signatory nations in their "annual migrations." Convention for the Protection of Migratory Birds, U.S.-Gr. Brit., Aug. 16, 1916, 39 Stat. 1702 ("Canada Treaty"). The Canada Treaty also specifically identifies "Anatidae, or waterfowl, including brant, wild ducks, geese and swans" as a protected bird family. *Id.* art. I, § 1(a).

---

[1] The *Hill* panel recounted the regulatory history. *See* 275 F.3d at 101–02. The first regulations implementing the Treaty Act in 1916 appeared to define "migratory bird" to include all swans, but in 1965 the Secretary added the requirement that the birds be "indigenous to the United States." *See id.* at 101 (quoting 30 Fed. Reg. 5,650 (Apr. 21, 1965)). Two years later, the Secretary again amended the regulations, adding a new definition that did not include the indigenous requirement, without striking the old definition. *Id.* at 102. These dual definitions remained in effect until the Secretary first published the disputed list in 1973. *Id.*

The *Hill* panel thought the relevant statutory and treaty language "strongly indicate[d]" that the mute swan is a protected migratory bird. 275 F.3d at 99. But the panel declined to hold that the plain meaning "positively foreclosed" the Secretary's interpretation. *Id.* at 105. The court's hesitation stemmed from the unusual regulatory scheme, *id.* at 99, the novelty of the question, and the traditional "great weight" that courts give to the Executive Branch's treaty interpretations, *id.* at 104 (quoting *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961)).

The court considered whether, despite the ostensibly plain text, the Secretary's interpretation might be permissible. *Id.* at 105. The Secretary offered three main reasons for excluding the species: the mute swan is not native to the United States; the mute swan is harmful to other protected bird species and their environments; and extending protection to the mute swan might conflict with other statutory obligations. *See id.* As to the first two points, the court had "no idea whether these arguments are pertinent, and, if so, whether they are compelling" because the agency record was "barren" on those issues. *Id.* at 105. The court therefore held that the Secretary failed to justify her interpretation and vacated the list insofar as it excluded the mute swan. *Id.* at 107.

## II.

With a merits victory secure, Hill petitioned the district court for an award of attorney's fees pursuant to the Equal Access to Justice Act. The Act authorizes an award of fees to a party prevailing against the government unless the government establishes that its position was "substantially justified or . . . special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). A position is substantially justified if the underlying agency action and the legal arguments in defense of the action had "a reasonable basis both in law and fact." *Pierce*

*v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted); *see also Halverson v. Slater*, 206 F.3d 1205, 1208 (D.C. Cir. 2000). That standard demands more than mere non-frivolousness, but less than a showing that the government's "decision to litigate was based on a substantial probability of prevailing." *Taucher v. Brown-Hruska*, 396 F.3d 1168, 1173 (D.C. Cir. 2005) (quoting *Spencer v. NLRB*, 712 F.2d 539, 557 (D.C. Cir. 1983)). The district court concluded that the Secretary's position was substantially justified and denied Hill's fee application on that basis. We review the district court's decision for abuse of discretion. *Id.* at 1172.

The Secretary's chief argument before the merits panel was that the Treaty Act did not apply to species of migratory birds that were not native to North America. The Secretary mustered ample evidence to support the factual assertion that the mute swan is an exotic species. According to the Secretary's expert testimony and documentary evidence, all feral North American mute swans are descended from escaped and released members of ornamental groups introduced into the United States.

In support of her assertion that the Treaty Act does not apply to exotic species, the Secretary argued that the taxonomic listing of bird families in Article I of the Canada Treaty reveals a latent ambiguity in the otherwise unqualified term "migratory birds." The treaty lists protected bird families, and each family name is followed by the common names of species and species groups in each family. *See* Canada Treaty, art. I, § 1(a); *see also* Protocol Amending the 1916 Convention for the Protection of Migratory Birds in Canada and the United States ("Canada Protocol") art. I, § 1, U.S.-Can., Dec. 14, 1995, Sen. Treaty Doc. 104-28. According to the Secretary, each enumerated species and at least some members of each enumerated group were native to the signatory nations. By contrast, many nonnative

species within each family were not listed. From that pattern, the Secretary argued, the Secretary reasonably understood the Canada Treaty to distinguish between native species and exotic species introduced to North America by man. The Secretary therefore believed it proper to limit the Treaty Act's protections to swan species native to North America.[2]

The Secretary further argued that reading the treaties to cover the mute swan would be a self-destructive interpretation. The mute swan is a beautiful bird but it can be nasty. The Secretary produced evidence that the species is a menace to other birds protected by federal law. A territorial aggressor and prolific procreator, the mute swan depletes native birds' food sources and occupies their nesting grounds. The Acting Director

---

[2] In response to this court's decision in *Hill*, the Migratory Bird Treaty Reform Act amended the Migratory Bird Treaty Act to limit its scope "only to migratory bird species that are native to the United States or its territories." Pub. L. No. 108-447, Div. E., Title I, § 143(b), 118 Stat. 2809, 3071 (codified at 16 U.S.C. § 703(b)(1)); *see also Fund for Animals v. Norton*, 472 F.3d 872, 877 (D.C. Cir. 2006) (noting the amendment was "a correction of what Congress believed to be an erroneous judicial interpretation of a treaty"). The Secretary argues that the Reform Act and its accompanying legislative history show conclusively that the Secretary's native-only interpretation was reasonable. It is true that, in other contexts, some courts sometimes treat an amendment that clarifies disputed statutory language as an expression of the original act's meaning. *See, e.g., Wesson v. United States*, 48 F.3d 894, 900–01 (5th Cir. 1995); *see also* 1A N. Singer, *Sutherland Statutes and Statutory Construction* § 22:31 (6th ed. 2008). On the other hand, there is reason to doubt the interpretative value of an amendment which, like the Reform Act, long postdates the amended statute. *Rainwater v. United States*, 356 U.S. 590, 593 (1958); *cf. Sullivan v. Finkelstein*, 496 U.S. 617, 628 n.8 (1990). But we need not decide the relevance of the Reform Act because we think the Secretary's position was reasonable even without it.

of the U.S. Fish and Wildlife Service concluded that "mute swans pose a serious threat to the ecological integrity of many areas, including the National Wildlife Refuge System and other Federal Lands committed to the maintenance of natural wildlife diversity."

The Secretary's concern about the impact of destructive exotic species like the mute swan had some basis in three of the migratory bird treaties. Provisions in the treaty with Japan, the treaty with the former Soviet Union, and the Canada Protocol required the signatory countries to control the importation of live animals that may be harmful to migratory birds or their environments. *See* Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, art. VI, U.S.-Japan, Mar. 4, 1972, 25 U.S.T. 3331; Convention Concerning the Conservation of Migratory Birds and their Environment, art. IV § 2(b), U.S.-U.S.S.R., Nov. 19, 1976, 29 U.S.T. 4649; Canada Protocol, art. IV. The Secretary also pointed out that some mute swans in North America were introduced only after the signing of the first migratory bird treaty in 1916.[3]

Of course the Secretary's position did not prevail. But the question is not whether the Secretary had the better arguments. It is enough that the Secretary's interpretation and legal arguments had a reasonable basis in fact and in the text and purpose of the controlling statute and treaties. There was nothing unusual or unsound about the Secretary's basic premise that an enactment's context and underlying policies can cast doubt on "'the most natural reading' of a statutory phrase."

---

[3] For example, the Secretary presented evidence that the entire mute swan population of the Chesapeake Bay — where Hill alleged aesthetic injury — descends from 5 ornamental swans that escaped from waterfront estates in 1962.

*Tataranowicz v. Sullivan*, 959 F.2d 268, 276 (D.C. Cir. 1992) (quoting *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991)). Nor did the Secretary's justification suffer from the defects common to positions that are not substantially justified. It was not "flatly at odds with the controlling case law," *Am. Wrecking Corp. v. Sec'y of Labor*, 364 F.3d 321, 326–27 (D.C. Cir. 2004) (internal quotation marks omitted), and the Secretary certainly did not press her position in "the face of an unbroken line of authority," *Precision Concrete v. NLRB*, 362 F.3d 847, 851–52 (D.C. Cir. 2004), or against a "string of losses," *Contractor's Sand & Gravel, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 199 F.3d 1335, 1341 (D.C. Cir. 2000) (internal quotation marks omitted). We are satisfied that the district court acted within its discretion in concluding that the Secretary's position was, on the whole, "justified to a degree that could satisfy a reasonable person." *Underwood*, 487 U.S. at 565.

That assessment is consistent with the merits panel's reasoning. *See Taucher*, 396 F.3d at 1174. The panel did not resolve the Secretary's arguments concerning the native–nonnative distinction or the bird's ecological impact either way. Instead the panel stated that these arguments amounted to "post hoc rationalizations" which could not save the regulation. *Hill*, 275 F.3d at 105 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The Secretary lost because the agency record was "utterly silent on any basis, let alone any reasonable basis, to support exclusion of the mute swan from the *List of Migratory Birds*." *Id*.

At the fee stage, however, an inadequate agency record is not necessarily fatal. *See F.J. Vollmer Co., Inc. v. Magaw*, 102 F.3d 591, 595 (D.C. Cir. 1996). We explained in *FEC v. Rose*, 806 F.2d 1081 (D.C. Cir. 1986), that the "adequacy of an agency's explanation" is in some cases "logically unrelated to whether the underlying agency action is justified under the

organic statute," *id.* at 1088. In this case, the Secretary took a reasoned position on a novel issue, and the sparse agency record did not "obviously defy the requirements of the [Administrative Procedure Act]." *Id.* at 1089. The void in the record did not result from the Secretary's failure to respond to "relevant and significant" comments. *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998). To the contrary, Hill identified no comment by any party concerning the exclusion of nonnative birds in response to the agency's notices of proposed rulemaking in 1973 and in 1984. 38 Fed. Reg. 10,208 (Apr. 25, 1973); 49 Fed. Reg. 23,197 (June 5, 1984).

Nor can we fault the Secretary for thinking the court might accept counsel's elaboration of the Secretary's interpretation. At least until the Supreme Court's decision in *United States v. Mead Corp.*, 533 U.S. 218 (2001), this court in some circumstances deferred to agency interpretations of statutes and regulations articulated for the first time in legal briefs.[4] *See, e.g., Ass'n of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1252 (D.C. Cir. 1998) (deferring to an agency's litigation position interpreting a statute where it appeared simply to articulate an explanation of longstanding agency practice); *Nat'l Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1129 (D.C. Cir. 1997). The Secretary took a reasonable approach to that relatively unsettled area of administrative law. *See Lundin v. Mecham*, 980 F.2d 1450, 1460 (D.C. Cir. 1992).

In sum, the thinness of the agency record at the merits stage does not alter our conclusion that the Secretary's

---

[4] The fee stage analysis focuses on the reasonableness of the government's position at the "time the government took this position." *Trahan v. Brady*, 907 F.2d 1215, 1219 (D.C. Cir. 1990). The government first took its litigation position before *Mead* was decided.

interpretation and arguments had a reasonable basis in fact and law. The district court did not abuse its discretion in so finding.[5]

*Affirmed.*

---

[5] We also deny Hill's request to increase her award of costs under Federal Rule of Civil Procedure 54(d) because she has not shown that the district court abused its discretion in calculating the costs.