**BANK MELLI IRAN; Bank Mellat,**
**Plaintiffs–Appellants,**

v.

**Shams PAHLAVI, aka H.I.H.**
**Princess Shams Pahlavi,**
**Defendant–Appellee.**

No. 94–55292.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 1995.

Decided June 29, 1995.

Steven D. Atkinson, Atkinson, Andelson, Loya, Ruud & Romo, Cerritos, CA, for plaintiffs-appellants.

Ralph Zarefsky, Baker & Hostetler, Los Angeles, CA, for defendant-appellee.

Before: FLETCHER, WIGGINS, and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

Bank Melli Iran and Bank Mellat (the Banks) filed this action for the purpose of enforcing certain judgments, which they had obtained against Shams Pahlavi in the tribunals of Iran. She is a resident of California and is the sister of the former Shah of Iran. The district court determined that at the times that the judgments were obtained Pahlavi could not have obtained due process of law in the courts of Iran. It, therefore, granted summary judgment in her favor. The Banks appeal and we affirm.

## BACKGROUND

In January of 1979, the Shah of Iran fled the country in the midst of the series of events that ultimately resulted in the creation of the Islamic Republic of Iran. Prior to that time, Pahlavi, the Shah's older sister, had signed a number of promissory notes.

The Banks, which were the holders of those notes and which are at the very least closely associated with the government, brought collection actions against Pahlavi in the courts of Iran. They served her by publication and in 1982 and 1986 obtained default judgments in the total amount of $32,000,000. They now seek to enforce those judgments pursuant to the Algerian Accords[1] and pursuant to the California Uniform Foreign Money–Judgments Recognition Act. Cal.Civ.Proc.Code §§ 1713–1713.8 ("Foreign Money–Judgments Act" or the "Act").

Pahlavi filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) to which she attached a number of documents containing extrinsic evidence to support her assertion that the judgments were rendered without due process of law. At a hearing on March 29, 1993, the district court recognized that this was a speaking motion and converted it to a motion for summary judgment. It then gave the parties a number of months to submit further evidence and on January 4, 1994 held the final hearing at which it granted summary judgment for Pahlavi. It is from that judgment that the Banks have now appealed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

■ We review the district court's interpretation of treaties and related executive orders *de novo*. *See United States v. Washington,* 969 F.2d 752, 754–55 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993). Executive agree-

ments, like the Algerian Accords, are interpreted in the same manner as treaties and reviewed by the same standard. *See Air Canada v. United States Dep't of Transp.,* 843 F.2d 1483, 1486 (D.C.Cir.1988); *see also Boeing Co.,* 771 F.2d at 1283–84.

■ We review grants of summary judgment *de novo. See Grove v. Mead Sch. Dist. No. 354,* 753 F.2d 1528, 1533 (9th Cir.), *cert. denied,* 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985).

## DISCUSSION

### A. *Summary Judgment Issues.*

■ Once the district court decided to convert Pahlavi's motion from a motion to dismiss to a motion for summary judgment, it was required to give the parties a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). In so doing, a district court need only apprise the parties that it will look beyond the pleadings to extrinsic evidence and give them an opportunity to supplement the record. *See Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994); *Grove,* 753 F.2d at 1532–33. The Banks complain that they did not have sufficient notice about the issues that the district court intended to consider. However, our review of the record makes it very clear that the Banks at the very least knew that the district court questioned whether due process was available to Pahlavi in the tribunals of Iran during the period from 1982 through 1986, that from what it had seen it doubted that due process was available, and that the parties should submit further information on that subject to it. There can be no doubt that the Banks knew that. Because that is the issue that the district court resolved in granting summary judgment, the Banks were neither misled nor subject to an erroneous decision in that respect.

■ The Banks also complain that they were improperly assigned the burden of persuasion. We agree that in reviewing a re-

---

1. *See* our discussion of the background and implementation of the Accords in *Islamic Rep. of Iran v. Boeing Co.,* 771 F.2d 1279, 1282–84 (9th Cir.1985), *cert. dismissed,* 479 U.S. 957, 107 S.Ct. 450, 93 L.Ed.2d 397 (1986).

quest for summary judgment it can be important to decide where the burden of persuasion lies. Here the Banks sought to enforce the judgment of the Iranian courts, and they had the burden of persuading the district court that they had judgments. *See, e.g., Hopkins v. Dow Corning Corp.,* 33 F.3d 1116, 1121 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995). However, this case largely turns on the issue of whether the judgments were obtained in a manner that comported with due process. The question, then, is whether the Banks must demonstrate that the judgments were so obtained or whether Pahlavi must demonstrate that they were not or could not have been.

In *Hilton v. Guyot,* 159 U.S. 113, 205–06, 16 S.Ct. 139, 159, 40 L.Ed. 95 (1895), the leading common law foreign money judgment case, the Supreme Court indicated that:

> When an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens, to recover a sum of money adjudged by a court of that country to be due from the defendant to the plaintiff, and the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is prima facie evidence, at least, of the truth of the matter adjudged....

That could be seen as a suggestion that the due process issue is part of the case which must be established by a plaintiff. However, the Court was not actually discussing burdens of persuasion, and a strong argument can be made that a claimed lack of due process should be treated as a defense. So doing would be consistent with the view of a leading commentary that "'[t]here is much sense in making the party who claims the unusual occurrence plead it affirmatively so that the usual assumptions may be indulged in as a matter of course wherever there is no such claim.'" 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1271, at 445 (1990) (citation omitted).

A number of courts have so treated it. *See Banque Libanaise Pour Le Commerce v. Khreich,* 915 F.2d 1000, 1005 (5th Cir.1990) ("Section five of the Texas Recognition Act provides that a 'foreign country judgment need not be recognized' if certain conditions exist. These conditions are phrased as affirmative defenses. Therefore, the burden of non-recognition rested with Khreich.") (citation omitted); *McCord v. Jet Spray Int'l Corp.,* 874 F.Supp. 436, 440 (D.Mass 1994) (two exceptions to the inclusive nature of foreign judgments were raised, and the court determined that the "act specifically limits the defenses that may be raised in an action to enforce a foreign judgment."); *Fiske, Emery & Assocs. v. Ajello,* 577 A.2d 1139, 1141–43, 41 Conn.Sup. 376, 378–381 (Conn.Super.Ct.1989) (the court noted that under the Foreign Money–Judgments Act, a foreign judgment will be recognized unless "one of the grounds for nonrecognition of the foreign judgment" is made out; the nonrecognition conditions were characterized as "defense[s]"). *Contra, Ackermann v. Levine,* 788 F.2d 830, 842 n. 12 (2d Cir.1986) (plaintiff sought enforcement of a foreign judgment under the Act and had to show *prima facie* that there was subject matter jurisdiction, personal jurisdiction, and that there were regular proceedings conducted by tribunals with procedures that are compatible with due process).

■  While the issue is extremely interesting, we need not resolve it at this time because, as we will show, whether Pahlavi had to put in sufficient evidence to sustain a defense or whether she had only to point to weaknesses in the Banks' case, she carried her burden. *See Celotex v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting) (heavier burden when moving party has burden of persuasion) and *Houghton v. South,* 965 F.2d 1532, 1536 (9th Cir.1992) (same). As the district court pointed out, Pahlavi's position was so persuasive that the Banks were going to have to point to something that refuted it. That was neither improper nor unfair.

**1410**

### B. The Merits.

Pahlavi's major bulwark against the Banks' attack is her assertion that the judgments cannot be enforced because she could not have had due process in Iran during the period that those judgments were obtained against her. That simple but crucial fact, she says, precludes enforcement of the Banks' judgments on any theory.[2] We agree with her premise, and, on the record of this case, we agree with the district court's conclusion as well.

■ It has long been the law of the United States that a foreign judgment cannot be enforced if it was obtained in a manner that did not accord with the basics of due process. *See Hilton,* 159 U.S. at 205–06, 16 S.Ct. at 159. As the Restatement of the Foreign Relations Law of the United States succinctly puts it: "A court in the United States may not recognize a judgment of a court of a foreign state if: (a) the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law...." § 482(1)(a) (1987).

We are aware of no deviation from that principle. In fact, as we have already shown, it was expressly incorporated into the Foreign Money–Judgments Act. Cal.Civ.Proc. Code § 1713.4; *see also Julen v. Larson,* 25 Cal.App.3d 325, 327–28, 101 Cal.Rptr. 796, 798 (1972); *cf. Bank of Montreal v. Kough,* 612 F.2d 467, 470–71 (9th Cir.1980) (the taking of jurisdiction must comport with due process). It can hardly be gainsaid that enforcement will not be permitted under California law if due process was lacking when the foreign judgment was obtained. Faced with that ineluctable proposition, the Banks argue that the Algerian Accords have somehow elided the due process requirement from the law of the United States as far as Pahlavi is concerned. With that we cannot agree.

The Algerian Accords do provide that Iran can bring actions to recover any of its assets from the family of the former Shah. *See Declaration of the Government of the Democratic and Popular Republic,* Point IV, para. 12, *reprinted in* Dep't St. Bull., Jan. 19, 1981, at 3 ("General Declaration").[3] They also provide that in litigation against the Shah's family "the claims of Iran should not be considered legally barred either by sovereign immunity principles or by the act of state doctrine and that Iranian decrees and judgments relating to such assets should be enforced by such courts in accordance with United States law." *Id.* at ¶ 14. It is upon this language that the Banks rest their claim that the United States courts cannot consider whether the judgments were obtained in accordance with due process. That is a foundation that crumbles under the weight the Banks seek to place upon it.

■ It is true that "[t]he clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" *Sumitomo Shoji Amer., Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982) (citation omitted). Where the Banks' argument goes awry is in the suggestion that the language in question removes due process considerations from the purview of the United States Courts. In the first place, it is notable that the Accords eliminate certain defenses—sovereign immunity and the act of state doctrine—but otherwise provide that enforcement of judgments shall be "in accordance with United States law." That law, of course, includes the due process requirement which we have already delineated.

Secondly, when Warren Christopher, then the former Deputy Secretary of State and

---

**2.** If that bulwark holds she need not fall back upon lesser ones, for example, lack of personal jurisdiction and statute of limitations bars. Of course, lack of personal jurisdiction, itself, has a due process aspect to it.

**3.** That includes its instrumentalities. *See* General Declaration, art. VII, para. 3, at 4. For purposes of this opinion, we will assume, without deciding, that the Banks are instrumentalities of

Iran. Although they have not submitted evidence to that effect, other courts have said that they are. *See New England Merchants Nat'l Bank v. Iran Power Generation & Transmission Co.,* 646 F.2d 779, 780, 791 (2d Cir.1981); *Itek Corp. v. First Nat'l Bank of Boston,* 511 F.Supp. 1341, 1342 (D.Mass.1981), *vacated,* 704 F.2d 1 (1st Cir.1983).

one of the chief architects of the Algerian Accords, addressed the concerned members of the Committee on Foreign Affairs of the House of Representatives in 1981, he assured them that "Iran's claims to the property of the Shah and his family will have to be adjudicated in U.S. courts in full accordance with due process of law." *Iran's Seizure of the United States Embassy: Hearings before the House of Representatives Committee on Foreign Affairs,* 97th Cong., 1st Sess. 149 (1981). It would be most surprising if what he really meant was that due process would be applicable if the initial action were brought in the courts of the United States, a rather obvious point, but that those same courts would be expected to enforce any judgment obtained in Iran, regardless of due process considerations. Absent strong evidence to the contrary—evidence not present in this record—the only reasonable inference is that the United States intended that enforcement "in accordance with United States law" include the due process requirements that are usually demanded by our courts when they review foreign judgments.

Finally, a construction of the Algerian Accords that permitted the taking of assets from a resident of this country by means of a judgment obtained without due process of law would raise grave questions about the enforceability of that part of the Accords. That question would be lurking in the case were we to accept the position that the Banks argue for. *See Boeing Co.,* 771 F.2d at 1284 (regarding lurking constitutional issues in the Accords); *cf. Dames & Moore v. Regan,* 453 U.S. 654, 688–89, 101 S.Ct. 2972, 2991, 69 L.Ed.2d 918 (1981) (court upholds Algerian Accords but notes that enforcement may leave residual constitutional issues, at least as against the United States Government.) We see no reason to stretch the language of the Accords and thereby create

those questions because we have no reason to think that the Accords were intended to change the law of this country in that backhanded a fashion. Thus, we hold that attempts to enforce judgments under the Algerian Accords are not exempt from due process defenses.[4]

Having so held, we are left with the question of whether the district court properly granted Pahlavi summary judgment on the due process issue. That is, did she show that she could not get due process in Iran? On this record, the answer is yes, as a precis of the evidence will show.

■ Pahlavi attached various reports to her motion to dismiss. Those included consular information sheets which gave travel warnings from 1981 through 1993 and noted that anti-American sentiment could make it dangerous to travel in Iran. In particular, the State Department noted that "U.S./Iranian dual nationals have often had their U.S. passports confiscated upon arrival and have been denied permission to depart the country documented as U.S. citizens." While those advisories apply to American nationals, there is no reason to believe that the Shah's sister would have fared any better. Further, a 1991 report on terrorism was attached. That report stated that even then Iran was a continuing state sponsor of terrorism. The report recounted the assassination of a former Iranian prime minister and his aide in Paris, France. *See Patterns of Global Terrorism: 1991,* Dep't of State Bull., April 1992 at 30. Again, one would anticipate that the Shah's sister would encounter great danger should she try to enter Iran.

In addition, other materials from the Department of State were obtained, pursuant to the request of the district court.[5] One of those documents is the portion of the Country Report on Human Rights Practices for

---

4. Pahlavi also insists that the Algerian Accords are not self-executing. No doubt that is true. *See Boeing Co.,* 771 F.2d at 1283. However, the Accords have been implemented by executive orders. *See id.* at 1284; *Itek Corp.,* 704 F.2d at 4; *see also* 31 C.F.R. § 535.217 (1994) (codifying para. 12 of Point IV of the General Declaration and specifically referring to the blocking of Pahlavi's assets in the United States); 31 C.F.R. § 535.301 (1994) (codifying Article VII, para. 3

of the General Declaration, defining what Iran and Iranian entity includes).

5. The Banks did not object to that. As Pahlavi notes, any objection to the consideration of those materials has been waived. *See Faulkner v. Federation of Preschool & Community Educ. Ctrs., Inc.,* 564 F.2d 327, 328 (9th Cir.1977) (per curiam).

1982 regarding Iran. *See* Report by Department of State to Committee on Foreign Relations U.S. Senate and Committee on Foreign Relations U.S. House of Representatives, 98th Cong.2d Sess. 1141 (Joint Comm. Print 1983).[6] That report indicates that trials are rarely held in public, that they are highly politicized, and that the regime does not believe in the independence of the judiciary. *Id. See also* Country Report for 1986 at 1159 (report detailing denials of fair public trial and discussing the purchase of verdicts in civil trials); Country Report for 1983 at 1259 (same); Country Report for 1984 at 1238 (same); Country Report for 1985 at 1237 (same). In addition, a 1990 declaration from Laurence Pope, a State Department official, was submitted. Pope declared that under the post-Shah regime "judges are subject to continuing scrutiny and threat of sanction and cannot be expected to be completely impartial toward U.S. citizens," and that "U.S. claimants can have little reasonable expectation of justice." The declaration also pointed out the fact that attorneys in Iran "have been officially discouraged from representing politically undesirable interests," and, "[w]itnesses to events living in Iran ... are likely to be subject to the same risks as lawyers." Those observations concentrated on the effect upon American citizens, but it can hardly be doubted that they would apply equally to Pahlavi. Further, the Country Report for 1986 suggested that people like Pahlavi (those with close ties to the Shah's regime) could not return to Iran without reprisals. *See* page 1163. That report also indicated that the revolutionary courts could take over cases that were formerly within civil court jurisdiction and could overturn the decisions of civil courts. *See* page 1159. Also, restraints on arbitrary actions of the revolutionary courts had been greatly weakened. *Id.*

Pahlavi did not put in a declaration which specifically stated that she would be treated badly by the regime. Her failure to present that more specific evidence does weaken her position somewhat. Nevertheless, a common sense reading of the evidence indicates that if it were the only evidence placed before the trier of fact a verdict would be directed in her favor on the ground that she could not possibly have obtained a fair hearing before the courts of Iran had she attempted to fight the Banks' claims against her.

That conclusion is further buttressed by decisions which recognize that in the early to mid–1980s Americans could not get a fair trial in Iran. *See McDonnell Douglas Corp. v. Islamic Rep. of Iran*, 758 F.2d 341, 346 (8th Cir.) ("We thus take judicial notice that litigation of the dispute in the courts of Iran would, at the present time, be so gravely difficult and inconvenient that McDonnell Douglas would for all practical purposes be deprived of its day in court."), *cert. denied*, 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 294 (1985); *Rockwell Int'l. Sys., Inc. v. Citibank, N.A.*, 719 F.2d 583, 587–88 (2d Cir.1983) ("Neither [party] argues that the post-revolutionary Iranian judicial system is capable of affording an adequate remedy; courts that have passed on this contention have consistently rejected it."); *Harris Corp. v. National Iranian Radio and Television*, 691 F.2d 1344, 1357 (11th Cir.1982) ("It is clear that the Islamic regime now governing Iran has shown a deep hostility toward the United States and its citizens, thus making effective access to the Iranian courts unlikely."). There is no reason to think that Pahlavi would have had better access to justice. After all, much of the hostility to United States citizens stemmed from this country's connection to the Shah's regime, and it is hardly necessary to say that Pahlavi's connection was, if anything, closer.

■ Of course, had the Banks put in any evidence of substance, summary judgment might have been averted. But the Banks' response to Pahlavi's evidence was information and belief declarations from their counsel. Those were entitled to no weight because the declarant did not have personal knowledge. *See Taylor v. List*, 880 F.2d 1040, 1045 n. 3 (9th Cir.1989); *Columbia Pictures Indus., Inc. v. Professional Real*

---

6. This and similar reports are hereafter referred to as "Country Report," followed by the year for which the report was issued.

*Estate Investors, Inc.,* 944 F.2d 1525, 1529 (9th Cir.1991), *aff'd,* —— U.S. ——, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993); *see also Garcia–Franco v. INS,* 748 F.2d 518, 519 (9th Cir.1984) (Duniway, J., concurring and dissenting) ("The only affidavit filed was one by [the] attorney.... In it, he repeats what he says in his motion, on information and belief. This was, on its face, a totally insufficient showing. It does not raise *any* issue....").

In addition, even if the material had been in proper form, the matters addressed by the declaration and the exhibits did not directly come to grips with the question placed at issue: whether Pahlavi could receive a fair trial in Iran. Instead, the information submitted merely indicated that service was made by publication, that Pahlavi should have received notice, and that Iranian experts had considered the claims against Pahlavi. Portions of the written law of Iran were also included.

■ The Banks did submit information to the effect that Pahlavi had argued in an earlier unrelated action that a claim against her would more properly be tried in Iran. Perhaps in so doing the Banks hoped for a kind of judicial estoppel, which would preclude Pahlavi from taking a different position in this case. *See Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990) (principles of judicial estoppel), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991). At any rate, a review of that information reveals that even in the former proceeding Pahlavi had complained that the Iranian government "has seen fit to nullify fundamental fairness and due process." Her actual argument was that the case should be dismissed on *forum non conveniens* grounds because Iran would be the proper place for trial. She then added that the fact that Iran would not give her a fair trial should not allow it to argue against her position that it was the most convenient forum. The result, therefore, would have been that Iran could not effectively take action against her here or there. That is not truly inconsistent with her present position.

In short, the Banks failed to show that there was a material issue of fact on the question of whether Pahlavi could receive a trial in Iran that would be characterized by a "system of jurisprudence likely to secure an impartial administration of justice." *Hilton,* 159 U.S. at 202, 16 S.Ct. at 158. Thus, summary judgment was properly granted in her favor.

CONCLUSION

Nations are not inexorably bound to enforce judgments obtained in each other's courts. However, our courts will enforce foreign judgments that arise out of proceedings which comport with basic principles of due process. Neither the Foreign Money–Judgments Act nor the Algerian Accords nor any case interpreting them deviates from that principle.

The evidence in this case indicated that Pahlavi could not expect fair treatment from the courts of Iran, could not personally appear before those courts, could not obtain proper legal representation in Iran, and could not even obtain local witnesses on her behalf. Those are not mere niceties of American jurisprudence. *Cf. Ma v. Continental Bank N.A.,* 905 F.2d 1073, 1076 (7th Cir.), *cert. denied,* 498 U.S. 967, 111 S.Ct. 430, 112 L.Ed.2d 414 (1990) (citing *Wuchter v. Pizzutti,* 276 U.S. 13, 48 S.Ct. 259, 72 L.Ed. 446 (1928)). They are ingredients of "civilized jurisprudence." *Hilton,* 159 U.S. at 205, 16 S.Ct. at 159. They are ingredients of basic due process.

Therefore, because Pahlavi would have been entitled to a directed verdict had this case gone to trial on this record, the conclusion that she was entitled to summary judgment was apodictic.

AFFIRMED.