# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 6, 2015          Decided August 5, 2016

No. 14-1215

ORY ESHEL AND LINDA CORYELL ESHEL,
APPELLANTS

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE,
APPELLEE

On Appeal from the
United States Tax Court

*Stuart E. Horwich* argued the cause and filed the briefs for appellants.

*Julie Ciamporcero Avetta*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Bridget M. Rowan*, Attorney. *Andrew Weiner*, Attorney, entered an appearance.

Before: GRIFFITH, MILLETT, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

2

MILLETT, *Circuit Judge*:  As a general rule, workers in the United States are taxed to support the payment of social security benefits to the retired and to individuals with disabilities.  The expectation is that, having contributed to the national economy while actively employed, those workers will later become eligible beneficiaries rather than supporters of the social security system.  *See Flemming v. Nestor*, 363 U.S. 603, 608–610 (1960).

That system gets complicated, however, for Americans who work overseas for part of their careers and, during those years, are required to pay taxes into a foreign government's social security system.  Foreign workers temporarily employed within the United States can sometimes confront a similar problem.

With Congress's blessing, Presidents have entered into so-called "totalization agreements" with foreign governments to limit social-security taxing rights to the country where the work is being done.  The agreements also allow overseas workers from both countries to obtain social security benefits based on the periods for which they make social security contributions to foreign governments.

This case involves a totalization agreement between the United States and France.  Specifically, the issue on appeal is whether or not two French taxes enacted into law after that totalization agreement was adopted "amend[] or supplement[]" the French social security laws covered by the agreement, and thus fall within the agreement's ambit.  The tax court declared the status of those French laws not by analyzing the text of the totalization agreement or the understanding of the parties, but by resorting to American dictionaries.  That was legal error.  Because insufficient consideration was given to the text and the official views of

the United States and French governments, we reverse and remand.

**I**

**A**

In 42 U.S.C. § 433, Congress authorized the President to enter into social security coordination agreements—known as totalization agreements—with other countries, *see id.* § 433(a). Absent such agreements, workers who divide their careers among and pay taxes to multiple countries might pay into the social security systems of various nations, yet fail to qualify for benefits under any one system. Totalization agreements permit those workers to combine periods of payment into different countries' social security systems to eventually become eligible to receive benefits under a signatory country's system. Workers' wages and self-employment income are generally exempt from United States social-security taxation to the extent that they are subject to foreign social-security taxation. *See* 26 U.S.C. §§ 1401(c), 3101(c), 3111(c).

Section 433 treats contributions to different countries' social security systems as establishing "periods of coverage," which are "period[s] of payment of contributions or [periods] based on wages for employment or on self-employment income[.]" 42 U.S.C. § 433(b)(2). Under a totalization agreement, employment creates a "period of coverage" under the social security system of one of the two signatories, but not both. *Id.* § 433(c)(1)(B)(i). That is, under Section 433, a citizen working in a foreign country makes payments to—and accrues periods of coverage under—only one social security system at a time.

4

Periods of coverage accrued under a foreign system may be combined with periods of coverage under the United States system "for the purposes of establishing entitlement" to United States social security benefits. 42 U.S.C. § 433(c)(1)(A). An individual may also qualify for separate benefit payments from multiple countries, in which case the benefits payable by each system are based on the proportion of the taxpayer's total periods of coverage accrued in each system. *Id.* § 433(c)(1)(C). Thus taxpayers whose careers take them from the United States to other countries do not suffer a diminution in their social security benefits upon retirement.

The United States generally taxes income earned by its citizens regardless of where the citizen resides, but a United States citizen may take a tax credit against his or her United States income tax liability for taxes paid to a foreign country. 26 U.S.C. §§ 901(a) & (b). That credit shields taxpayers from double taxation. In contrast, taxes paid to a foreign country in accordance with a social security totalization agreement are not eligible for such a tax credit:

> Notwithstanding any other provision of law, taxes paid by any individual to any foreign country with respect to any period of employment or self-employment which is covered under the social security system of such foreign country in accordance with the terms of an agreement entered into pursuant to section 233 of the Social Security Act [42 U.S.C. § 433] shall not, under the income tax laws of the United States, be deductible by, or

creditable against the income tax of, any such individual.

26 U.S.C. § 1401 note.

Under that provision, a foreign tax will not be eligible for a tax credit if it is paid (i) with respect to a period of employment covered under the social security system of a foreign country, and (ii) "in accordance with" the terms of a totalization agreement. *See Erlich v. United States*, 104 Fed. Cl. 12, 17 (2012) (A tax is not creditable under this section when the "payment is consistent with the obligation of the taxpayer under the [totalization] agreement.").

**B**

In 1987, the United States and France entered into a social security totalization agreement ("Totalization Agreement"). *See* Agreement on Social Security Between the United States of America and the French Republic, March 2, 1987, 2260 U.N.T.S. 145, *available at* https://www.ssa.gov/international/Agreement_Texts/french.html. In Article 2(1), the Totalization Agreement identifies the laws of each country under which qualifying taxes may be paid. The covered United States laws are specified provisions of the Social Security Act and the Internal Revenue Code.[1] The covered French laws are eight enumerated categories of

---

[1] Specifically, the covered provisions of United States law are: "Title II of the Social Security Act and regulations pertaining thereto, except sections 226, 226A and 228 of that title and regulations pertaining to those sections," and "Chapter 2 and Chapter 21 of the Internal Revenue Code of 1986 and regulations pertaining to those chapters[.]" Totalization Agreement, Art. 2(1)(a).

French social security laws.[2] The Totalization Agreement also covers taxes paid under "legislation which amends or supplements the laws specified[.]" Totalization Agreement, Art. 2(3).

This case involves two payments made to the French government: *Contribution Sociale Géneralisee* (General Social Contribution, abbreviated as CSG) and *Contribution pour le Remboursement de la Dette Sociale* (Contribution for the Repayment of Social Debt, abbreviated as CRDS). Both were enacted after the Totalization Agreement went into effect.

---

[2] The covered provisions of French law are: (i) "laws establishing the administrative organization of social security programs"; (ii) "laws establishing the social insurance system for nonagricultural employees and laws establishing the social insurance system for agricultural employees"; (iii) "laws on prevention and compensation of occupational accidents and illnesses," and "laws on nonoccupational accident insurance and insurance against occupational accidents and illnesses for self-employed persons in agricultural occupations"; (iv) "laws on family benefits"; (v) "laws concerning special social security systems to the extent they relate to the risks or benefits covered by the laws enumerated in the preceding clauses, but excluding the special system for civil servants"; (vi) "the law on the system for seamen"; (vii) "laws concerning sickness and maternity insurance for nonagricultural self-employed workers and laws concerning sickness and maternity insurance for agricultural self-employed workers"; and (viii) "laws concerning old-age allowances and old-age insurance for nonagricultural self-employed workers, laws concerning old-age and invalidity insurance for clergymen and members of religious orders, laws concerning old-age and invalidity insurance for attorneys, and laws concerning old-age insurance for agricultural self-employed workers." Totalization Agreement, Art. 2(1)(b).

The CSG law was enacted in December 1990. It is codified in the *Code de la Sécurité Sociale* (Social Security Code), which is not an enumerated French law in Article Section 2(1)(b) of the Totalization Agreement, but includes most provisions governing social security benefits in France. CSG on employment income is withheld by the employer in the same manner as other social security taxes and appears on the employee's pay stub as a social contribution. Employers remit CSG directly to the *Unions de Recouvrement des Cotisations de Sécurité Sociale et d'Allocations Familiales* (Union for the Recovery of Social Security and Family Allowances Premiums). The Union is a network of private organizations, the main task of which is to collect the employee and employer social security contributions that finance France's social security system.

CSG revenues are allocated to five separate funds within the French government: the National Family Allowances Fund, compulsory health schemes, the Old-Age Solidarity Fund, the National Solidarity Fund for Autonomy for the elderly and disabled, and the Social Debt Redemption Fund. The Social Debt Redemption Fund is dedicated primarily to the retirement of debt incurred to fund French social security programs in the 1990s, but it also appears to finance certain payments made to France's general budget. The percentage of CSG devoted to the National Solidarity Fund and the Social Debt Redemption Fund is variable.

The CRDS law was enacted in January 1996 and is not codified. CRDS is withheld and collected in the same manner as CSG. CRDS proceeds go to the Social Debt Redemption Fund.

In 2001, the French government amended the social security code to provide that CSG and CRDS are payable only

by individuals who are covered by a compulsory French sickness insurance scheme. However, a 2012 amendment made CSG and CRDS also applicable to gains realized on the sale of French real property by non-French residents.

### C

Ory and Linda Coryell Eshel are married and are dual citizens of the United States and France. In 2008 and 2009, they resided in France, and Mr. Eshel earned a salary for services performed in France. The Eshels paid various French taxes, including CSG, CRDS, and French income, unemployment, and social security taxes. Because Mr. Eshel worked for a non-American employer, he was not required to pay social security taxes to the United States.

As United States citizens, the Eshels were liable for United States income taxes for 2008 and 2009. They timely filed federal income tax returns for both years, claiming credits for French income tax, French unemployment tax, CSG, and CRDS. The CSG and CRDS credits amounted to $19,061 for 2008 and $32,672 for 2009.

The Internal Revenue Service initially denied the entire foreign tax credit for both years, but later conceded that all of the claimed credits were valid except for CSG and CRDS. The Eshels timely petitioned the tax court for redetermination of the deficiencies. The parties also filed cross-motions for summary judgment on the issue of whether CSG and CRDS are foreign taxes that can be credited against tax liability.

The tax court granted summary judgment for the Commissioner. Because both CSG and CRDS were adopted after the Totalization Agreement went into effect, the tax court agreed with both parties that the central question was

whether the laws adopting those two taxes "amend or supplement" the French laws enumerated in Article 2(1)(b) of the Totalization Agreement. To answer that question, the tax court turned to four American dictionaries to define "amend" and "supplement," and on the basis of those definitions concluded that the phrase should mean "(1) formally altering one or more of these laws by striking out, inserting, or substituting words; (2) adding something to make up for a lack or deficiency in one or more of these laws; or (3) adding something to extend or strengthen the French social security system as a whole." J.A. 143 (citing Webster's New World College Dictionary (4th ed. 2010); Black's Law Dictionary (9th ed. 2009); American Heritage Dictionary (4th ed. 2000); Webster's New World Dictionary (2d coll. ed. 1980)).

Relying on its dictionary definitions, the tax court reasoned that CSG and CRDS "amend or supplement" the designated French laws as long as they "add[] something to extend or strengthen the French social security system as a whole." J.A. 143. The tax court also noted that both taxes are administered by French social security officials and are collected in the same manner as French social security taxes. The court then determined that CSG "amends" the French social security laws because it adds words to the *Code de la Sécurité Sociale*, where most French social security laws are codified. *Id.* at 149. The tax court also decided that CSG and CRDS "supplement" the French social security laws because they fund some benefits under laws identified in Article 2 and discharge debt previously incurred to pay social security benefits. *Id.* at 149–150.

The tax court accordingly ruled that, because CSG and CRDS "amend or supplement" the French social security laws specified in the Totalization Agreement, they qualify as payments made "in accordance with" the Totalization

Agreement and cannot be credited against United States income tax liability. J.A. 124; 26 U.S.C. § 1401 note.

## II

We review *de novo* the tax court's grant of summary judgment, and can affirm only if there is no genuine dispute as to any material fact and the Commissioner is entitled to judgment as a matter of law. *See, e.g.*, *Byers v. Commissioner*, 740 F.3d 668, 675 (D.C. Cir. 2014) (citing Fed. R. Civ. P. 56(a)).

## A

The issue in this case is whether CSG and CRDS "amend[] or supplement[]" the French laws enumerated in Article 2(1)(b), within the meaning of the Totalization Agreement. If they do, they are covered by the Totalization Agreement and the Eshels may not claim them as a credit on their United States tax returns. If they do not, they fall outside of the Agreement, and the Eshels may credit them against their United States income tax liability.

The tax court's conclusion that CSG and CRDS "amend[] or supplement[]" the designated French laws was the product of asking the wrong legal question. Rather than looking to the text of the Totalization Agreement or the signatory countries' shared understanding, the tax court asked only what "amends or supplements" means in domestic dictionaries, as it might do if construing a purely domestic statute.

But the Totalization Agreement is not a domestic statute. It is an executive agreement with a foreign country: initiated by the State Department, negotiated by the Social Security Administration, signed by the President and a foreign

government, and effective only after submission to Congress. *See* Allison Christians, *Taxing the Global Worker: Three Spheres of International Social Security Coordination*, 26 VA. TAX REV. 81, 90–91 (2006). Executive agreements must be interpreted under the same principles applicable to international treaties. *See Air Canada v. United States Dep't of Transportation*, 843 F.2d 1483, 1486 (D.C. Cir. 1988); *see also Kwan v. United States*, 272 F.3d 1360, 1362 (Fed. Cir. 2001); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1408 (9th Cir. 1995).

International executive agreements and treaties are primarily "compact[s] between independent nations," *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1232 (2014) (quoting *Medellín v. Texas*, 552 U.S. 491, 505 (2008)), and it is "our responsibility to read [them] in a manner 'consistent with the *shared* expectations of the contracting parties,'" *Lozano*, 134 S. Ct. at 1232 (emphasis in original) (quoting *Olympic Airways v. Husain*, 540 U.S. 644, 650 (2004)). Our goal is "to ascertain the intent of the parties by looking to the document's text and context." *Lozano*, 134 S. Ct. at 1232 (quoting *United States v. Choctaw Nation*, 179 U.S. 494, 535 (1900)). To that end, it is inappropriate to make the United States' maxims for statutory construction unilaterally dispositive. "Even if a background principle is relevant to the interpretation of federal statutes, it has no proper role in the interpretation of treaties unless that principle is shared by the parties to 'an agreement among sovereign powers.'" *Lozano*, 134 S. Ct. at 1232 (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996)).

Instead, the tax court should have started with the Totalization Agreement's plain text. "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín*, 552 U.S. at 506. The text of a treaty or executive

agreement controls "unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" *United States v. Stuart*, 489 U.S. 353, 365–366 (1989) (quoting *Sumitomo Shoji America v. Avagliano*, 457 U.S. 176, 180 (1982)).

Here, the Agreement's text provides powerful evidence of its meaning. Article 1 defines certain terms in the Agreement, but does not define "amends or supplements." For those undefined terms, Article 1 directs that "[a]ny term not defined in this Article shall have the meaning assigned to it in the laws which are being applied." Totalization Agreement, Art. 1(10). The Agreement defines "laws," in turn, as "the laws and regulations specified in Article 2." *Id.* Art. 1(3). Those Article 2 laws are the laws covered by the Agreement: the eight enumerated types of French laws, two United States laws, and "legislation which amends or supplements the laws specified[.]" *Id.* Art. 2(3). Thus, whether CSG and CRDS "amend[] or supplement[]" the enumerated French laws is fundamentally an inquiry into the content and meaning of the Article 2 laws—in this case, the Article 2(b) French laws. For that reason, determining the "meaning" of "amend[ing] or supplement[ing]" the French laws should have at least in part been informed by French law.

The problems with the tax court's approach do not stop there. The tax court also improperly divorced "amends or supplements" from its textual object. Rather than asking whether CSG and CRDS amend or supplement "the laws specified" in Article 2(1)(b), the tax court considered whether CSG and CRDS amend or supplement the "French social security system *as a whole*." J.A. 143 (emphasis added). The court erroneously relied on the relationship between CSG and

CRDS and the French social security program generally, noting only that revenues from the taxes were allocated in some (unknown) part to social security schemes and debt incurred by social security programs. In short, the plain text of the Totalization Agreement forecloses the definition the court applied, which looked not to "the laws specified," Article 2(3), but the French social security system as a whole.

Finally, at oral argument, the Commissioner admitted not knowing what one of the recipients of CSG taxes—the National Solidarity Fund for Autonomy—"actually funds." Oral Arg. Tr. 36. But the Commissioner "submit[ted] that that's immaterial because," as long as a levy supplements *some* "categories of laws that are included in the Treaty, the fact that some portion of the revenue is directed elsewhere does not mitigate th[e] conclusion" and the entire tax is deemed subject to the Totalization Agreement. *Id.* at 36. Indeed, in the Commissioner's view, the CSG and CRDS would "amend[] or supplement[]" the French laws in the Totalization Agreement if even a *single Euro* of their proceeds funded any law included in the Agreement. *Id.* at 48–49 (Q: "Your view of this agreement * * * is that if it were even de minimis one Euro it would count as 'supplement'?" A: "Based on the way that * * * the agreement is drawn, yes.").

That extreme reading of the Totalization Agreement rests on nothing more than the Commissioner's own say-so. It lacks any grounding in the Agreement's text or in any principle governing the interpretation of international agreements. The tax court's corresponding disregard of the Totalization Agreement's textual direction concerning the role of French law in resolving undefined terms and in determining the content of the laws enumerated in Article 2(1)(b) was error and requires reversal.

**B**

To the extent that ambiguity remains about the status of CSG and CRDS and their relationship to the identified French laws, the tax court should have consulted sources illuminating the "shared expectations of the contracting parties," such as "the negotiating and drafting history" and "the postratification understanding of the contracting parties." *Zicherman*, 516 U.S. at 223. Additionally, "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo*, 457 U.S. at 184–185; *see also Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961).

For instance, in *Kolovrat*, the Supreme Court held that a treaty between the United States and Serbia trumped a state statute that would have limited the ability of aliens to inherit property. 366 U.S. at 188–189. In so holding, the Supreme Court relied upon "diplomatic notes exchanged between the responsible agencies of the United States and of Yugoslavia" to guide its determination of the agreement's meaning. *Id.* at 194.

Likewise, in *Sumitomo*, the Court analyzed whether Sumitomo was a company of Japan under the Friendship, Commerce, and Navigation Treaty between the United States and Japan. 457 U.S. at 179. As evidence of the Japanese position, the Court looked to a cable from the Japanese Ministry of Foreign Affairs to the Secretary of State, explicitly stating that a company in Sumitomo's position was not covered by the relevant provision of the treaty. *Id.* at 184. As evidence of the federal government's position, the Court looked to the brief for the United States as *amicus curiae*,

which communicated the State Department's position and conformed with Japan's view. *Id.* at 184 n.10.

The tax court failed to follow that direction, relying instead on nontextual sources that did not purport to communicate the countries' official positions or shared expectations.

The Commissioner argues that the United States government has consistently regarded CSG and CRDS as covered by the Totalization Agreement. But he builds that argument with the wrong tools. He relies on only a declaration of an individual in the Social Security Administration and a 1997 letter from the United States embassy, neither of which purports to offer an authoritative statement of the view of the United States as a party to the Totalization Agreement, let alone to reflect the *shared* understanding of both signatory governments.

The declaration on which the Commissioner relied is by Vance Teel, the Associate Commissioner of the Office of International Programs of the Social Security Administration. In it, Teel states: "Based on information available to me and to the best of my understanding and belief," CSG and CRDS are covered by the Totalization Agreement. J.A. 60–61. That is it. Teel provides no explanation about what information was available to him, nor does he identify the source of his understanding and belief. More to the point, the government conceded that the declaration "is not establishing an official state position of the United States of America" as a party to the Totalization Agreement, Oral Arg. Tr. 26, nor does it purport to document a settled understanding of the taxes' status.

The 1997 letter is equally insufficient. The letter is from Donald Bandler, the interim head of the United States embassy in France at that time, and is addressed to the French Minister of Social Affairs and Employment. The letter discusses the tax treatment of United States "detached" workers in France—that is, United States citizens working in France for a United States employer for a period of less than five years. J.A. 120; *see* Totalization Agreement, Art. 6(1). Detached workers are covered only by the tax laws and the social security system of the United States. Unlike the Eshels, they do not make payments into the French social security system. Totalization Agreement, Art. 6(1). In the letter, Bandler challenges the imposition of CSG and CRDS on detached workers and urges the French Minister to change his policy to treat CSG and CRDS as covered by the Totalization Agreement, and thereby inapplicable to United States detached workers.

But that just shows that, at that time, the French government was imposing CSG and CRDS on United States detached workers. The letter thus suggests that the French government considered the taxes to be outside of the Totalization Agreement, and thus at most might indicate a conflict between the French and American positions, not a shared understanding. But it cannot even do that because the letter's author asserted no authority to speak for the State Department or the United States government as a party to the Agreement. Nor did counsel claim that the letter had any such weight. To the contrary, counsel for the Commissioner again admitted at oral argument that "nothing I say here is a pronouncement on the position of the United States in any matters related to foreign relations." Oral Arg. Tr. 24.[3]

---

[3] In 2001, the French government passed legislation that ended the imposition of CSG and CRDS on United States detached workers.

The Commissioner's position, moreover, is the legal equivalent of trying to clap with one hand. The question of whether CSG and CRDS amend or supplement the French laws in the Totalization Agreement turns on the shared expectations of both the United States and French governments, which are grounded in the provisions of the Agreement that address the role of French law in discerning the amended or supplemented content of the French laws enumerated in Article 2(b). *See* Totalization Agreement, Art. 1(10).

The Eshels, for their part, relied principally on three statements of the French government: a 1999 statement by the French Finance Minister in answer to a parliamentary question, a French "Statement of Practice" from 1998, and a statement of the French Minister of Foreign Affairs in May 2007. *See* J.A. 24, 25, 70. The Eshels also provided the expert report of Philippe Derouin, a Paris tax lawyer. *See id. at* 94–113.

The Eshels, however, offer little to no context for those assorted ministerial statements, and the record contains only excerpts of each. At this juncture, the Eshels provide no sound basis for this court to conclude as a matter of law that the statements represent the view of the French government on either the proper interpretation of the Totalization Agreement or on whether CSG and CRDS amend,

---

If CSG and CRDS had actually amended or supplemented the designated French laws, the taxes would have fallen within the Totalization Agreement, raising a question as to the need for such independent legislation.

supplement, or have any other legal relationship to the French laws specified in the Totalization Agreement.[4]

Moreover, the Eshels' evidence primarily speaks to whether CSG and CRDS are covered by the French Income Tax Treaty, which coordinates the French and American assessment of income tax realized by residents of the foreign counterparty on domestic sources. At oral argument, the Eshels explained that the Income Tax Treaty and the Totalization Agreement are mutually exclusive: they cannot cover the same tax "if they give you different answers." Oral Arg. Tr. 18. That argument certainly remains open to be explored on remand, but at this procedural juncture and on this limited record, it cannot be conclusive. Indeed, the Eshels' own expert acknowledged that there is "no judicial or administrative precedent in France expressly addressing the question whether CSG and CRDS are covered by the U.S.-France Totalization Agreement." J.A. 94.

## C

The central problem in this case is that the tax court's resort to American dictionary definitions pretermitted the critical inquiry into the Agreement's text and the signatory countries' shared understanding of the Agreement. The text strongly suggests that the question whether CSG and CRDS amend or supplement the designated French laws—which is fundamentally an inquiry into the content and meaning of the textually enumerated French laws—should have involved reference to French law. Instead of heeding this instruction,

---

[4] At oral argument, the Eshels represented that those ministers are overseen by the French liaison agencies identified in the Administrative Arrangement—the Center for Social Security of Migrant Workers and the National Independent Social Security Fund for Miners—but nothing in the record substantiates that point.

the tax court consulted outside sources that were not reliable expressions of either textual construction or the signatories' intent.

In short-circuiting those inquiries, the tax court invoked Tax Court Rule 146, which provides that a dispute over foreign law is a legal, not a factual, dispute. We have no disagreement with that point. *See* Fed. R. Civ. P. 44.1 ("In determining foreign law * * * [t]he court's determination must be treated as a ruling on a question of law."); *see also McKesson Corp. v. Islamic Republic of Iran*, 753 F.3d 239, 242 (D.C. Cir. 2014) (This court "review[s] *de novo* * * * the district court's interpretation of foreign law.").

Where the tax court went astray was in the sources of *legal* authority on which it relied. In resolving difficult questions of foreign law and in attempting to ascertain the views of a foreign government on an agreement to which it is a party, courts are empowered to "insist on a complete presentation by counsel." Fed. R. Civ. P. 44.1 Advisory Committee Notes 1966. If the litigants' submissions come up short, the court may choose to "request a further showing by counsel, or engage in its own research, or direct that a hearing be held, with or without oral testimony, to resolve the issue." Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure, § 2444 Proof of Foreign Law (3d ed. 1998).[5] Courts may also request *amicus* submissions from the United States providing its official position on the interpretation of an agreement with a foreign government, and can ask the State Department to provide the views of the foreign government.

---

[5] Those principles for district court litigation apply with equal force to this type of tax court determination. *Cf. Byers*, 740 F.3d at 675 ("We review decisions of the Tax Court 'in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury.'") (quoting 26 U.S.C. § 7482(a)(1)).

When, as here, the trial court failed to inquire properly into the meaning of an international agreement, remand is appropriate. *See Tobar v. United States*, 639 F.3d 1191, 1200 (9th Cir. 2011) ("[T]he district court apparently did not recognize that, in its discretion, it could inquire further into the content of Ecuadorian law."); *cf. Railway Labor Executives' Ass'n v. United States Railroad Retirement Bd.*, 749 F.2d 856, 864 (D.C. Cir. 1984) (remanding to the Railroad Retirement Board because the Board did not coherently articulate why Canadian immigration regulations were covered by the relevant United States statutes).

## III

The Totalization Agreement is an international executive agreement that must be interpreted in light of its full text and the shared expectations of the contracting governments. Because the tax court committed legal error in its analysis of those questions, we reverse the judgment of the tax court and remand for further proceedings consistent with this opinion.

*So ordered.*